PHILEMON WOODRUFF and FREDERICK WOODRUFF, appellants,

*v.*

ANDREW TEAS, respondent.

The court of appeals reversed a decree of the court of chancery, founded on the opinion of Vice-Chancellor Bird, to the effect that the evidence in the case showed the existence of a partnership between P. and F. (the appellants) and T. (the respondent), under a secret, written agreement for manufacturing articles under a patent obtained by T., one-half of which patent was owned by F., which agreement made P. responsible to F. for any losses he might incur through such partnership; and also showed that P. destroyed this written agreement during a prior litigation for an infringement of patents, brought by third parties against P. and T., and after an injunction therein had been obtained; and also held that a judgment confessed by P. on behalf of T., but without notice to T., for an alleged claim of F.'s against T. (P. being then the attorney for both F. and T., and having been such for years), in an action brought at P.'s suggestion by a third party, who had no real interest therein, should be set aside, and that P. and F. account for the chattels sold under such avoided judgment.

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following conclusions :

This bill asks to have a certain transaction between the complainant and defendants declared to be a partnership, and that a judgment, confessed by said Teas to one Benton, for the benefit of said Frederick Woodruff, be declared void and set aside.

The resistance of the defendants goes to every length. The contest is of such nature—involves so much of character—that I cannot simply announce my conclusions. It seems to be an imperative duty to state a few of the important parts of the evidence.

It should be understood that Teas was a client of Philemon Woodruff, an attorney-at-law, and had been for five years prior to the transaction in question, and that Frederick Woodruff was Philemon's brother, and was, also, his client.

Woodruff *v.* Teas.

 Was there a partnership between these three? The transaction was the manufacture of saddle-trees under a patent obtained by Teas, one-half of which Philemon Woodruff had purchased, of one Halsey, for his brother, Frederick Woodruff. Teas was a mechanic and understood his trade; as intimated, Philemon Woodruff was a practicing attorney, and Frederick Woodruff had money. It was claimed by another company that this patent was an interference with one under which they were manufacturing. The exact terms under which the parties became associated is left somewhat in doubt, because the written agreement, entered into at the commencement, was afterwards destroyed. And yet the loss of that instrument is not so material, because enough seems to have been proved to enable the court to decide what, under the law, the real agreement was, and thereby fix the relation of the parties. The destruction of the instrument was at the instance of Philemon Woodruff, and Teas consented to it. It was destroyed at a time when a suit was pending against Teas and Philemon Woodruff, charging them with liability for infringement. The presumption which arises from this destruction, at such time, must be taken against the defendants in this case. I thus conclude, because Philemon Woodruff was chiefly responsible for the act, he being a party to it, and also the acknowledged attorney of both Teas and Frederick Woodruff. He proposed its destruction, on the ground that an injunction had issued against them, as already stated. One or more suits were pending at that time.

 Teas says that the agreement, in substance, provided that

"Frederick Woodruff was to furnish what money was necessary to carry on the saddlery business; Philemon Woodruff was to attend to the law business, and I was to do the work, and each to share and share alike—divide the profits into three parts—or, until such time as these profits were to be made, I was to draw a weekly salary, first, $18 per week for six weeks, and then I came down to $15."

 The defendants say that Teas was to do the work, Frederick Woodruff was to advance the money, Philemon Woodruff was to be the legal adviser; Frederick Woodruff was to be paid one-third of the profits for his loan, and Philemon Woodruff

one-third for his advice. They say, further, that Frederick Woodruff had the right to confess judgment against Teas, and in favor of Frederick Woodruff, for the amount of his loans, at any time when Teas should become intoxicated. This last statement Teas denies. But whether part of the agreement or not, in the view I take of the case, is not material. Both Frederick Woodruff and Philemon Woodruff say, that it was expressly agreed that the relation between them should not be one of copartnership.

The inquiry comes with great force, why destroy the agreement if it formally provided that there should be no partnership, and the counsel believed in truth that there was no partnership? Why should a party to an agreement made for his own protection, as this seems to have been, procure its destruction, unless its terms revealed some other fact, condition, or relation, than the one so formally announced and directly in hostility to it? But this effort to conceal is a striking and remarkable feature of this case, and, to a great extent, the case must be judged by it.

In 1879, Teas and one King and Philemon Woodruff entered into an agreement respecting the management of a pending suit in chancery for Teas. In January, 1884, a suit was begun against Teas and Philemon Woodruff for the infringement of patents, and the complainant therein, believing that Philemon Woodruff was in some way interested in the business, so charged, and in an affidavit said :

"That deponent is informed and believes, that the defendant Woodruff is engaged with the defendant Teas in carrying on the business of making and selling said saddle-trees."

This affidavit was filed about one year after the making of the alleged agreement of copartnership, which agreement must have been destroyed within a very few days of the filing of this affidavit. To this affidavit Philemon Woodruff replied by affidavit, dated February 9th, 1884, saying :

"That he is not now, and that he never has been, a partner of Andrew Teas in any business whatever, and that, so far as he knows or believes, the said Teas is the sole owner of the saddle-tree business now carried on by him."

Woodruff v. Teas.

Some time in October, 1884, Philemon Woodruff made another affidavit, in opposition to a motion to dissolve an injunction granted in favor of Teas, in which, in speaking of the transactions between Teas and Frederick Woodruff, he said:

"These loans were all made upon the following conditions: (1) That if said Teas should resume drinking, deponent should forthwith have the right to enter up judgment against him for the amount loaned, and take possession of the business and control it. (2) That the deponent should have the right, at any time, to inspect the books, and stop the business if unprofitable."

Here is a statement of an absolute right to take possession and control, and also to inspect the books and stop the business if unprofitable. These *things* show that the Woodruffs had a very strong hand in the business, at all events, whether as copartners or not. Respecting those matters, some testimony was taken, and Philemon Woodruff must be credited with the view he then entertained of his relation to Teas. When asked if he ever had any partnership agreement with Teas, either verbal or written, he answered, "I never did." When asked if he had any agreement which was destroyed after the suit was begun, he said, "I decline to answer the question." He also declined to answer: "Had you an interest in his business, or a claim upon it, which was changed after that suit brought against you, and put in another form?" And also the question: "Was there not, at one time, an arrangement between you and Teas and Frederick Woodruff, substantially to the effect that Teas should give his work and skill in the business, you to act as counsel, and Frederick Woodruff to put in the money, all share in the profits in the same way?" When asked what the other provisions of the contract were, he also declined to answer. But, in that same inquiry, Frederick Woodruff stated that the terms of the written agreement were:

"That Teas should be the proprietor; give his whole attention to it; receive one-third of the profits; for the first six weeks should have advanced to him $18 per week, to be repaid out of his share of the profits; Philemon Woodruff should act as counsel; should have a general supervision of the business; should have full power at any time to close up the business by such procedure as he might see fit; should have the power to confess judgment against Teas,

in Teas's name; Frederick Woodruff was to furnish money to conduct the business up to the sum of $2,000, without interest; Philemon Woodruff and Frederick Woodruff were each to receive a sum equivalent to one-third of the profits; and that the arrangement was to be considered in no sense a partnership, and that it should not be represented as such under any circumstances."

Frederick Woodruff made this statement after being warned by his brother, Philemon Woodruff, that he need not answer the question which led to it. And I think that this statement of Frederick Woodruff is quite in conformity to the statement on this head in the answer in this cause.

In this answer, besides stating the original agreement and its destruction, the defendants state what they claim the new or substituted agreement was, viz.: (1) The written agreement was to be canceled. (2) For the money which had been loaned, notes were to be given, with interest from date of loans. (3) The defendants were to give up their interest in the profits. (4) Philemon Woodruff should make no claim for services in the past, and should receive reasonable compensation for future services, and Frederick Woodruff should receive nothing but interest on his money. (5) Philemon Woodruff should have the same power to stop the business, and to confess judgment, that he had under the written agreement. And in this cause, Philemon Woodruff, under oath, states the agreement to have been what his brother had formerly said it was.

Now, Philemon Woodruff had agreed with his brother, Frederick Woodruff, to protect him from all loss for moneys advanced in this enterprise, and he admits that he was desirous of concealing this fact from the parties who had obtained an injunction against Teas. This injunction against Teas was obtained February 11th, 1884, and between that date and the 16th of February, the written agreement was burned.

These statements have been made in order to show more fully the force of the effort at concealment, as displayed in the following quotation from an affidavit made by Teas, but prepared by Philemon Woodruff, viz.:

"Deponent further says, that he does not know who informed the complainant Tompkins that the defendant Woodruff was engaged with him in

Woodruff v. Teas.

carrying on business, or the ground of his belief, but the fact is, that the defendant Woodruff is not his partner, is not responsible for the debts of the business, has never been represented by the deponent to any person or persons as his partner, is not engaged in business with him, and never has been; that his relations with said Woodruff are those of client and counsel, and have been such for five years, and that, during that period, his relations with said Woodruff have been most friendly, and that the litigations of deponent have been such as to place him in almost daily contact with him."

It ought to be remarked, that Teas swears that he remonstrated against signing such an affidavit, and that Woodruff told him it was all right, and that it was in accordance with the real agreement between them. I think, on the same day, Philemon Woodruff himself made an affidavit, in which he said, "that he believes the said affidavit of Andrew Teas to be true in all respects."

The case is either greatly illuminated or mystified by the following questions and answers adduced before me, presented here not only for the purpose of showing Philemon Woodruff's view of the case, but also to further convince the court that there was a settled determination to keep some important fact concealed. Referring to the affidavits from which I have just made extracts, the examination of Philemon Woodruff proceeded thus:

"*Q.* Was not the point of that suit, one point of that suit, to find out whether you were in any way connected in business, and if so, in what way; now, will you answer that?

"*A.* I am perfectly willing to answer the question, and I will answer it; the bill charged that Andrew Teas and Philemon Woodruff were trading together under the name of Andrew Teas; that was the only charge made in the bill; these affidavits were made for the purpose of refuting the idea that we were trading together, as well as other matters referred to in the affidavits.

"*Q.* Then did you not understand the point to be, whether you were trading together, whether as partners or not, in some connection or under some agreement with Andrew Teas with reference to this business; did you not understand that?

"*A.* Yes.

"*Q.* In meeting that allegation, as you understand it, did you prepare the affidavit of Teas, and swear that it was true, as I have heretofore stated?

"*A.* Yes, sir.

"*Q.* Did you, in that affidavit or in any other, state any facts revealing the real nature of the connection?

"*A.* I did not.

"*Q.* Did you purposely suppress it?

"*A.* What I did, I did ; I don't know what my purpose was at that time. .

"*Q.* I ask you, Mr. Woodruff, as a lawyer, under oath, did you consciously, deliberately and purposely, in that affidavit in reply to that bill, suppress the real nature of your agreement with Teas?

"*A.* I cannot say that I suppressed anything; what I stated, I stated ; you ask whether, at any time, in my affidavit, I did state what the contents of our agreement was ; I never did until after the 5th of July, 1884.

"*Q.* Did you not, in making your reply to that motion for injunction, consciously suppress the real nature of your agreement with Teas, to wit, that you and your brother were engaged to receive a sum equal to one-third of the profits, and that you were responsible to him for half the loss ; did you not consciously suppress that?

"*A.* I think not.

"*Q.* Did you, in fact, suppress it?

"*A.* In fact it didn't appear.

"*Q.* Did you, purposely, cause it not to appear by failing to make it appear in the affidavit ?

"*A.* I failed to make it appear in the affidavit; whether—what purpose was in my mind at that time, I cannot tell now, but I can say that it was not the intention at that time, either of Mr. Teas or myself, to reveal what the exact position of affairs was.

"*Q.* Then you intentionally suppressed it ?

"*A.* So you say.

"*Q.* Don't you say so ?

"*A.* I do not.

"*Q.* Do you mean that you forgot it ?

"*A.* I do not."

Further on, Philemon Woodruff stated :

" I did not suppress or conceal, so far as I now recollect, anything in connection with that case ; I simply answered the bill to meet the case as it was presented in the bill.

"*Q.* Did you state the real contract as it existed ?

"*A.* I did not."

Teas, the present complainant, swears that, when Philemon Woodruff expressed a desire to destroy the agreement, three suits had been brought, one or two of which were against both Teas and Philemon Woodruff. His language is :

" Philemon Woodruff told me, as my counsel, that he thought the better way would be, as him and his brother were responsible, for us to do away with the agreement, and, as they could not get anything of me before the final decree in my case, in my suit against them, it would be better to save them any

danger, and the agreement should go on just the same as it had before be- tween us, each drawing one-third of the profits, and in that manner it would not make any difference to me, he told me, and he acted as my counsel all the way through, and he said he thought that I could trust him, and I told him that I would do whatever he told me, and we burned the agreement."

The fact that Philemon Woodruff kept the cash account of this business, and acted as "the banker of Andrew Teas," and that Frederick Woodruff gave some of his personal attention to the business, add force to the other circumstances which have been already given.

I conclude that these parties had, by their agreement, created a copartnership. I also conclude that, having created a copart- nership, they could not prevent or thwart the legal consequences of that relation between themselves, by entering into an agree- ment that their relation should not be considered a copartnership, when the object of such agreement was simply to mislead the public. This does not, in any sense, conflict with the right of any person to furnish labor or capital for a fixed share of the profits without becoming liable as a partner.

I conclude that the judgment confessed by Philemon Wood- ruff against Teas should be declared null and void. Philemon Woodruff says it was part of the agreement that he was to be at liberty to confess such judgment in case Teas became intoxicated. Teas denies this. But, granting that the right once existed, and that it was never revoked, I cannot see how a court of equity can sustain the proceedings. According to Philemon Woodruff, about the 20th of June, 1884, Teas, through intoxication, became wholly incapacitated for business and continued so for some time. Philemon Woodruff placed the claim of his brother against Teas in the hands of another attorney, and directed him to bring suit thereon in the name of one Benton. This was done, and Phile- mon Woodruff acknowledged service of process and gave a *cog- novit*, and thus had judgment entered without giving Teas any notice whatever of any of the proceedings. Execution was issued and a sale had. In a few days Philemon Woodruff had a re- ceiver appointed, and that, too, without giving any notice to Teas or to any one who represented him. All of the proceedings were

Woodruff *v.* Teas.

taken in Benton's name, only to blind or mislead others. Frederick Woodruff was the real party, and Philemon was his brother. Frederick Woodruff furnished the capital, and Philemon was his counsel, and had guaranteed to share one-half of any loss, if not all, resulting from the venture.

The case shows that Philemon Woodruff had the most unbounded influence over Teas, and that this influence arose from that most intimate relation of counsel and client. Teas was as helpless as a child. Philemon Woodruff had been his confidential adviser for five years, and had procured his brother to advance money to establish this business, and had become possessed of all of Teas's secrets respecting his patents and his prospects in life.

And now, see from the following, how wise and salutary the law is that requires courts of equity to rip up and scatter to the winds all such transactions; Philemon Woodruff is interrogated:

"*Q.* Did you, personally, notify him [Teas] that you had signed, or were about to sign a *cognovit* to confess judgment against him?

"*A.* I did not.

"*Q.* Did you do that because you thought it was for his benefit and advantage, in the exercise of your best judgment as to his true interests, acting as his counsel?

"*A.* I did.

"*Q.* Had you any other motive?

"*A.* I had.

"*Q.* What other?

"*A.* To protect the interests of Frederick Woodruff.

"*Q.* Did you state, yesterday, in your examination, in my absence, that you had guaranteed your brother against loss by reason of these transactions?

"*A.* I did.

"*Q.* Is that the truth?

"*A.* It is.

"*Q.* Then your motive was the protection of your brother and your own relief as his guarantor?

"*A.* Secondarily; yes.

"*Q.* Then, in entering that judgment, you occupied the position of the sole and only counsel of Andrew Teas, the defendant, in the protection of his, Teas's, interest, and the counsel of your brother and yourself, as his guarantor, in the protection of their interests against Andrew Teas; did you occupy both?

"*A.* I did both and more; I have been more, because it was in pursuance of an agreement that was made at the time the loans were made."

Further on Philemon Woodruff says : · " I did that thing, primarily, in the interest of Andrew Teas ; secondarily, in the interests of others,"—that is, himself and his brother ; verily, " No servant can serve two masters," much less three, especially when one is a brother and the other is insatiable self.

I think there was a copartnership, and that it had continued, notwithstanding the destruction of the agreement, or that, at all events, all of the assets on hand are properly subject to all the legal consequences of such relation, even though there was a dissolution ; I think the judgment should be declared null. and void ; and also that there should be an accounting for the full value of all the goods and chattels which were disposed of under that judgment and the execution issued thereon.

The complainant is entitled to all the costs of this suit except the costs of the accounting, which will be reserved for future consideration and disposed of hereafter.

*Mr. F. W. Stevens,* for the appellants.

*Mr. H. G. Clayton* and *Mr. A. Q. Keasbey,* for the respondent.

PER CURIAM.
This decree unanimously reversed.